**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **VINCENT S. DICIOCCIO, ESQ.,** | : | |
| **Administrator of the Estate of** | : | |
| **HENDRICO F. SALATA, SR.,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 14-1772** |
| | : | |
| **DON Y. CHUNG, M.D.,** *et al.*, | : | |
| **Defendants.** | : | |

<u>**MEMORANDUM OPINION**</u>

**RUFE, J.**                                                                                                    **JANUARY 19, 2017**

Before the Court are the Motion for Partial Summary Judgment of Defendant Pottstown

Hospital Company, LLC (which operates Pottstown Memorial Medical Center, or "PMMC"), the

Motion for Summary Judgment of Defendant Don Y. Chung, M.D., and the Motion to Dismiss

of Defendant Nainesh Patel, M.D.  For the reasons that follow, the motions will be denied.

## I.   BACKGROUND

This case concerns Hendrico F. Salata, Sr.'s death less than twenty-four hours after his

discharge from PMMC, where he had arrived two days earlier complaining of chest pain.  The

following facts are not in dispute.[1]  On May 28, 2012, at approximately 2:47 a.m., Mr. Salata

arrived at PMMC's emergency department complaining of chest pain, which he rated as a

"7/10."[2]  In triage, Mr. Salata's chief complaint was noted as "Chest Pain – Suspected Cardiac."[3]

During a primary assessment at approximately 3:00 a.m., Mr. Salata reported that the pain had

begun two-to-four days earlier, radiated to the neck and jaw, and was "intermittent," among

---

[1] The facts are taken from PMMC's statement of stipulated material facts unless otherwise noted, and are largely relevant to PMMC's motion.  Doc. No. 72.  While Dr. Chung does not necessarily agree with the facts as PMMC presents them, Doc. No. 77 (Dr. Chung's Motion for Summary Judgment) at 3-5, any factual disagreements among Defendants are immaterial to the Court's decision.

[2] Doc. No. 72 ¶ 2.

[3] *Id.* ¶ 3.

other things.[4]  A full examination performed approximately ten minutes later revealed similar

symptoms, and Mr. Salata also reported that he was a smoker with a history of hypertension.[5]

A cardiac monitor attached during the primary assessment showed that Mr. Salata's

pulses were palpable, strong, and intact.[6]  Laboratory tests ordered in the emergency room

showed cardiac risk factors including a triglyceride level of 840 (compared to a normal range of

120-200); an HDL level of 19 (compared to a normal range of 28-55); a cholesterol level of 241

(compared to a normal range of 120-200); and a glucose level of 128 (compared to a normal

range of 65-99).[7]  Dr. Chung, who treated Mr. Salata on May 28, testified during his deposition

that a potential cause of these symptoms was "unstable angina," and that this diagnosis was not

ruled out at the time.[8]  Nonetheless, at 3:32 a.m., Mr. Salata's condition was noted as "stable"

and he was placed on "observation status" under the care of Dr. Chung.[9]

"Observation" is one of three statuses that patients at PMMC may be assigned, with the

other two options being "inpatient" admission or "outpatient" treatment.[10]  The distinction

between inpatient admission and admission for observation is important for the present motion,

but the record is mixed on this point.  Richard McLaughlin, the Chief Medical Officer of

PMMC, testified at his deposition that the difference is "purely a financial or payor or insurance

classification at Pottstown," and that a patient admitted either "inpatient or observation" receives

---

[4] *Id.* ¶¶ 5-6.

[5] *Id.* ¶ 8.

[6] *Id.* ¶ 11.

[7] *Id.* ¶ 15.

[8] *Id.* ¶ 18.

[9] *Id.* ¶¶ 16-17.

[10] *Id.* ¶ 27(a) (quoting Dr. Chung as testifying that at PMMC, there are "three kind[s] of places that a patient can go: One, admit to inpatient; two, place in observation; three, outpatient").

"the same exact bed, same exact unit and the same exact care."[11]   Heather Richards, one of the nurses who treated Mr. Salata in observation, also testified:  "I don't treat my patients any differently whether they're an observation patient or an inpatient."[12]

However, Dr. Chung testified that he decided to place Mr. Salata in "observation" rather than to admit him as an "inpatient," that it is always the physician who "makes the determination whether someone is merely there for observation versus [] being admitted to the hospital," and that the distinction between admitting someone inpatient versus placing them in observation status is based on "clinical criteria."[13]   Dr. Chung also testified that he placed Mr. Salata in observation because Mr. Salata did not meet the clinical requirements for inpatient admission.[14] Specifically, Mr. Salata's "initial enzymes were within normal limits, his chest pain had improved, [and] he did not require any IV medications."[15]   Accordingly, at approximately 7:35 a.m., Mr. Salata left the emergency room for the primary care unit and was placed "in observation."[16]   Mr. Salata's admission-for-observation order noted that he was to receive continuous cardiac monitoring and EKGs "as necessary."[17]

At 12:20 p.m., approximately nine hours after arrival, Mr. Salata was noted as having some chest discomfort while eating.[18]   By the next day, May 29, Dr. Chung had gone off service and was not in the hospital or on duty.[19]   Dr. Patel, the consulting cardiologist, testified that he

---

[11] *Id.* ¶ 24.

[12] *Id.* ¶ 26.

[13] *Id.* ¶¶ 27(b)-(d).

[14] *Id.* ¶ 27(e).

[15] *Id.*

[16] *Id.* ¶¶ 20, 23.

[17] *Id.* ¶ 27.

[18] *Id.* ¶ 28.

[19] Doc. No. 77-1 (Dr. Chung's Statement of Stipulated Material Facts) ¶ 4.

last saw Mr. Salata at approximately 9:00 a.m. on May 29, and that at that point, he believed that Mr. Salata's symptoms were reflux related, and were not caused by unstable angina.[20]  At 9:20 a.m., Dr. Patel's nurse practitioner, Barbara Speelhoffer, stated that Mr. Salata could be discharged from a cardiac perspective.[21]

At 10:30 a.m., Mr. Salata suffered an episode of "severe substernal burning," but no one notified Dr. Patel or Ms. Speelhoffer.[22]  Dr. Patel testified that he informed his office on May 29 that Mr. Salata needed a "nuclear stress test" to rule out definitively whether his symptoms were caused by unstable angina, but no stress test was performed before Mr. Salata's discharge.[23]

Mr. Salata was discharged at approximately 11:30 a.m. on May 29.[24]  The discharge progress note listed his primary diagnosis as "esophageal reflux" with a secondary diagnosis of "essential hypertension, unspecified benign or malignant."[25]  At the time of his discharge, Mr. Salata was sitting upright, and his progress note stated that proton pump inhibitors given for reflux "[had] significantly improved [his] symptoms."[26]  Mr. Salata was given discharge instructions entitled "ACUTE CORONARY SYNDROME DISCHARGE INSTRUCTIONS" upon leaving PMMC.[27]  Less than twenty-four hours later, on May 30, at 7:55 a.m., Mr. Salata again presented to PMMC's emergency department, this time as a "full code" with CPR in progress.[28]  He was pronounced dead two minutes later.[29]

---

[20] Doc. No. 72 ¶ 30.

[21] *Id.* ¶ 32.

[22] *Id.* ¶¶ 33-35.

[23] *Id.* ¶¶ 36, 41, 42.

[24] *Id.* ¶ 37.

[25] *Id.*

[26] *Id.* ¶ 38.

[27] *Id.* ¶ 39.

[28] *Id.* ¶ 40.

Plaintiff, as administrator of Mr. Salata's estate, then filed suit in this Court against PMMC, Dr. Chung, and Dr. Patel, alleging five claims:  (1) wrongful death against all Defendants; (2) a survival action against all Defendants; (3) negligence against all Defendants; (4) corporate negligence against PMMC; and (5) a failure-to-stabilize claim under the Emergency Medical Treatment and Active Labor Act ("EMTALA") against PMMC.[30]  PMMC has moved for summary judgment on the EMTALA claim only; Dr. Chung has moved for summary judgment on all claims against him; and Dr. Patel has moved to dismiss all claims for lack of subject-matter jurisdiction in the event that the Court grants PMMC's motion on the EMTALA claim, because the remaining claims all arise under state law, rather than federal law.

## II.    LEGAL STANDARD

A court will award summary judgment on a claim or part of a claim where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[31]  A fact is "material" if resolving the dispute over the fact "might affect the outcome of the suit under the governing [substantive] law."[32]  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[33]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[34]

---

[29] *Id.*

[30] Doc. No. 1 (Complaint).  The Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiff's EMTALA claim arises under federal law, and exercises supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S. Code § 1367.

[31] Fed. R. Civ. P. 56(a).

[32] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[33] *Id.*

[34] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

Further, "a court may not weigh the evidence or make credibility determinations."[35] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[36] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[37] This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[38] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[39]

## III.   DISCUSSION

### A. PMMC's Motion for Summary Judgment

PMMC moves for summary judgment on Plaintiff's EMTALA claim, arguing that: (1) Mr. Salata's admission to the primary care unit for observation ended its duty to stabilize under EMTALA and therefore precludes liability; and (2) Plaintiff cannot satisfy the requirements for an EMTALA failure-to-stabilize claim. Because the parties invoke EMTALA's text, statutory purpose, and implementing regulations in arguing their positions, the Court provides a brief background.

"Congress enacted EMTALA in the mid-1980s based on concerns that, due to economic constraints, hospitals either were refusing to treat certain emergency room patients or transferring them to other institutions"—a practice known as "patient dumping."[40] Accordingly,

---

[35] *Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998).

[36] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[37] *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

[38] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

[39] *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[40] *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 172-73 (3d Cir. 2009) (citations omitted).

"EMTALA requires hospitals to provide medical screening and stabilizing treatment to individuals seeking emergency care in a nondiscriminatory manner."[41]  "[A]ny individual who suffers personal harm as a direct result of a hospital's violation" of EMTALA may then "bring a private civil action for damages" under the statute.[42]  While EMTALA actions are usually brought in conjunction with state-law claims such as medical malpractice or negligence, EMTALA "does not create a federal cause of action for malpractice."[43]  That is, EMTALA "[l]iability is determined independently of whether any deficiencies in the screening or treatment provided by the hospital may be actionable as negligence or malpractice, as the statute was aimed at disparate patient treatment," not medical malpractice.[44]

### 1.  Whether Mr. Salata's Admission for Observation Precludes EMTALA Liability

PMMC first argues that its EMTALA stabilization duties ended when it placed Mr. Salata in observation, and that it therefore cannot be held liable for failing to stabilize Mr. Salata.[45]  This argument is based on the growing line of cases holding that a hospital's duty to stabilize under EMTALA ends when the hospital admits the patient, provided that the admission is not a

---

[41] *Id.* at 173.  The parties have stipulated that PMMC is a "participating hospital" subject to EMTALA's requirements.  Doc. No. 72 ¶ 1.

[42] *Torretti*, 580 F.3d at 173 (citing 42 U.S.C. § 1395dd(d)).  A hospital also may be held vicariously liable under EMTALA for the actions of its medical personnel.  *Id.* at 173 n.8 (citing *Burditt v. HHS*, 934 F.2d 1362, 1374 (5th Cir. 1991)).

[43] *Id.* (citations omitted).

[44] *Id.* at 174; *see also Delibertis v. Pottstown Hosp. Co.*, 152 F. Supp. 3d 396, 399 (E.D. Pa. 2016) ("[L]iability [under EMTALA] is determined independently of whether any deficiencies in the screening or treatment provided by the hospital may be actionable as negligence or malpractice.").

[45] Doc. No. 76 (PMMC's Motion for Partial Summary Judgment) at 1-3.  The relevant provision of EMTALA, 42 U.S.C. § 1395dd(b)(1), provides:

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

subterfuge to avoid EMTALA obligations.[46]  Although the Third Circuit has never addressed this

issue, courts in this District have adopted this rule, reasoning that because EMTALA was

intended as a limited solution to the practice of "patient-dumping," rather than as a federal

malpractice statute, its stabilization obligations do not extend beyond the emergency room and

the good-faith admission of a patient precludes an EMTALA claim.[47]  Plaintiff does not take

issue with this general rule, but argues that because Mr. Salata was placed in "observation,"

rather than admitted as an "inpatient," EMTALA's stabilization requirements applied.  The Court

agrees.

　　　　EMTALA's text is ambiguous regarding whether Mr. Salata's admission for observation

cuts off liability, and there is a dearth of case law on the subject as well.  However, regulations

bearing on this issue have been promulgated by the Centers for Medicare & Medicaid Services

("CMS"), the agency within the Department of Health and Human Services responsible for

implementing EMTALA.[48]  "CMS has the congressional authority to promulgate rules and

regulations interpreting and implementing Medicare-related statutes such as EMTALA," and

---

[46] *See, e.g.*, *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1168 (9th Cir. 2002) ("We hold that EMTALA's stabilization requirement ends when an individual is admitted for inpatient care."); *Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 350 (4th Cir. 1996) ("[The plaintiff's] essential contention is that EMTALA imposed upon the hospital an obligation not only to admit [the patient] for treatment of her emergency condition, which concededly was done, but thereafter continuously to 'stabilize' her condition, no matter how long treatment was required to maintain that condition.  Such a theory requires a reading of the critical stabilization requirement in subsection (b)(1) of EMTALA that we cannot accept.").  Notably, the Sixth Circuit has refused to endorse this view, and does not consider inpatient admission a defense to EMTALA liability.  *See Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 583 (6th Cir. 2009) (holding that "a hospital may not release a patient with an emergency medical condition *without first determining that the patient has actually stabilized*, even if the hospital properly admitted the patient").

[47] *See Hollinger v. Reading Health Sys.*, Civil Action No. 15-5249, 2016 WL 3762987, at *9 (E.D. Pa. July 14, 2016) (concluding that "in-patient admission [is] a defense to EMTALA liability permitted that admission was not a deliberate effort to avoid EMTALA obligations"); *Mazurkiewicz v. Doylestown Hosp.*, 305 F. Supp. 2d 437, 447 (E.D. Pa. 2004) ("[T]he most persuasive synthesis of the law on admission as a defense to EMTALA liability is that admission is a defense so long as admission is not a subterfuge.").

[48] *See Torretti*, 580 F.3d at 174 (looking to CMS regulations for guidance regarding the scope of EMTALA liability); *see generally Chevron USA, Inc. v. Natural Res. Defense Council, Inc*., 467 U.S. 837, 843 & n.9, n.11 (1984) (explaining that when an agency with the power to construe a statute has provided a construction, courts should defer to that interpretation if it is permissible).

courts generally "defer to a government agency's administrative interpretation of a statute unless it is contrary to clear congressional intent."[49]  Here, both parties cite the CMS regulations in support of their positions, and neither argues that the Court should not defer to them.[50]

The CMS regulations provide a limited exception to EMTALA's obligations, but only in the event that a hospital "admits [an] individual *as an inpatient*."[51]  The relevant CMS Final Rule, issued in 2003, also makes clear that CMS interprets "hospital obligations under EMTALA as ending once the individuals *are admitted to the hospital inpatient care*."[52]  Nowhere do the regulations state that admission for observation similarly ends a hospital's EMTALA obligations.  To the contrary, later CMS interpretive guidance makes clear that observation status does *not* qualify as inpatient admission for purposes of EMTALA liability.  In 2009, CMS explained: "Individuals who are placed in observation status are not inpatients, even if they occupy a bed overnight.  Therefore, *placement in an observation status of an individual . . . does not terminate*

---

[49] *Torretti*, 580 F.3d at 174 (citations omitted).

[50] *See* Doc. No. 76 at 2; Doc. No. 88 (Plaintiff's Response to PMMC's Motion for Partial Summary Judgment) at 2-3.

[51] 42 C.F.R. § 489.24(d)(2)(i) ("If a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual *as an inpatient* in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual.") (emphasis added).

[52] Medicare Program; Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals With Emergency Medical Conditions, 68 Fed. Reg. 53,222, 53,245 (Sept. 9, 2003) (emphasis added); *see generally Torretti*, 580 F.3d at 174 (explaining that the 2003 "Regulation and Final Rule address where and when EMTALA applies").

CMS issued another Final Rule in 2008 that again clarified the scope of EMTALA but retained the carve-out for individuals admitted as inpatients.  *See* Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2009 Rates; Payments for Graduate Medical Education in Certain Emergency Situations; Changes to Disclosure of Physician Ownership in Hospitals and Physician Self-Referral Rules; Updates to the Long-Term Care Prospective Payment System; Updates to Certain IPPS-Excluded Hospitals; and Collection of Information Regarding Financial Relationships Between Hospitals, 73 Fed. Reg. 48,434, 48,661 (Aug. 19, 2008) ("[W]e are clarifying the EMTALA regulations at § 489.24(f) with respect to hospital inpatients by stating that once an individual is admitted in good faith by the admitting hospital, the admitting hospital has satisfied its EMTALA obligation with respect to that individual . . . .").

*the EMTALA obligations of that hospital or a recipient*."[53]   The Court gives "substantial

deference" to CMS's "interpretation of its own regulations," and concludes that Mr. Salata's

admission for observation did not end PMMC's EMTALA obligations.[54]

This conclusion is reinforced by CMS's Healthcare Benefit Policy Manual, in which

CMS expressly defines "observation status" as an outpatient status, as opposed to an inpatient

status.[55]   The Manual explains that "[t]he purpose of observation is to determine the need for

further treatment or for inpatient admission" and "a patient receiving observation services may

improve and be released, or be admitted as an inpatient."[56]   "Observation" status thus differs

from "inpatient" status in that it is used to determine whether an individual should be admitted as

an inpatient or discharged; it is not simply another form of inpatient admission with different

insurance consequences, as PMMC suggests.   It therefore makes sense to distinguish between

admission for observation and inpatient admission for purposes of determining EMTALA

liability.

PMMC raises three arguments as to why admission for observation precludes EMTALA

liability.   First, PMMC advances a strained interpretation of the CMS regulations, arguing that

---

[53] CTRS. FOR MEDICARE & MEDICAID SERVS., S&C-09-26, INPATIENT PROSPECTIVE PAYMENT SYSTEM (IPPS) 2009 FINAL RULE REVISIONS TO EMERGENCY MED. TREATMENT AND LABOR ACT (EMTALA) REGULATIONS (MAR. 6, 2009), *available at* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/SCLetter09-26.pdf (emphasis added).

[54] *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citations omitted).

[55] Medicare Benefit Policy Manual, Ch. 6, § 20.6(B) ("When a physician orders that a patient receive observation care, the patient's status is that of an outpatient.").  Other courts have found that the CMS Policy Manual is entitled to persuasive weight in similar contexts.  *See Estate of Landers v. Leavitt*, 545 F.3d 98, 107 (2d Cir. 2008) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 221 (2001)) (granting *Skidmore* deference to CMS policy manual regarding definition of "inpatient" and concluding that "CMS's interpretation is entitled to a great deal of persuasive weight").

[56] Medicare Benefit Policy Manual, Ch. 6, § 20.6(B).

"inpatient" can be defined to include patients placed in observation status.[57]  PMMC's argument

is based on 42 C.F.R. § 489.24(b), which defines "inpatient" as:

> an individual who is admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services as described in §409.10(a) of this chapter with the expectation that he or she will remain at least overnight and occupy a bed even though the situation later develops that the individual can be discharged or transferred to another hospital and does not actually use a hospital bed overnight.[58]

PMMC then turns to § 409.10(a), which defines "inpatient hospital services" as including

a variety of services, including "bed and board," "nursing services," and other similar services.[59]

PMMC argues that because patients placed in observation at PMMC may receive these services,

they qualify as "inpatients" under § 489.24(b), and therefore Mr. Salata's admission for

"observation" constitutes "inpatient" admission sufficient to cut off EMTALA liability.  This

argument runs contrary to CMS's own guidance, however, which plainly states that admission

for observation status "does not terminate the EMTALA obligations of that hospital or a

recipient."[60]  CMS's 2003 Final Rule, in which the "inpatient" carve-out was first codified, also

explains that for EMTALA purposes, "[g]enerally a person is considered an inpatient *if formally

admitted as an inpatient*."[61]  Thus, even if Mr. Salata received the services listed in § 409.10(a),

he did not qualify as an inpatient under the CMS regulations because he was not "formally

admitted" as one.

---

[57] Doc. No. 85 (PMMC's Reply in Support of Motion for Partial Summary Judgment) at 7-9.

[58] 42 C.F.R. § 489.24(b).

[59] 42 C.F.R. § 409.10(a).

[60] Ctrs. for Medicare & Medicaid Servs., S&C-09-26, Inpatient Prospective Payment System (IPPS) 2009 Final Rule Revisions to Emergency Med. Treatment and Labor Act (EMTALA) Regulations (Mar. 6, 2009), *available at* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/SCLetter09-26.pdf.

[61] 68 Fed. Reg. at 53,247 (emphasis added).

PMMC points to the District of Massachusetts' decision in *Bryson v. Milford Regional Medical Center, Inc.*, in support of its interpretation, but that case is not binding on this Court and does not discuss the CMS regulations.[62]  The opinion in *Bryson* did suggest that good-faith admission "for observation only" could end a hospital's EMTALA obligation, but the court ultimately did not resolve the admission issue and instead concluded that the plaintiff had failed to make out an EMTALA claim because she had been transferred to another hospital in compliance with EMTALA, which is not the issue here.[63]  The Court thus does not find the *Bryson* decision helpful.[64]

Second, PMMC argues that ending EMTALA liability once a patient is admitted for observation best accords with the statute's purpose.  PMMC reasons that EMTALA was designed to prevent the "dumping" of uninsured or underinsured patients, and that an individual's admission for observation fulfills this goal, similar to inpatient admission.[65] However, as explained in the CMS Policy Manual, observation status is not the same as inpatient admission, but is used to determine *whether* a patient should be admitted for further treatment or discharged.  "In other words, observation is sometimes necessary in order to identify whether a hospital would be violating EMTALA by releasing or transferring a particular patient."[66] Holding that admission for observation bars EMTALA liability would thus create an end-run

---

[62] Civil Action No. 11-40052-TSH, 2014 WL 1327471, at *4-5 (D. Mass. Mar. 27, 2014).

[63] *Id.* at *5 ("The question of Plaintiff's admission need not be answered, because the case turns on the question of the Plaintiff's appropriate transfer.").

[64] The other cases cited by PMMC do not help its argument as they stand for the general rule that inpatient admission cuts off EMTALA liability, but do not address the separate issue of whether placing a patient in observation status qualifies as inpatient admission under EMTALA.  *E.g.*, *Hollinger*, 2016 WL 3762987, at *9 (finding "*in-patient admission* a defense to EMTALA liability permitted that admission was not a deliberate effort to avoid EMTALA obligations") (emphasis added).

[65] Doc. No. 85 at 6-7.

[66] Jacqueline Fox, *Reforming Healthcare Reform*, 50 U. RICH. L. REV. 557, 577-578 (2016) ("Observation status floats in a precarious limbo in relation to EMTALA precisely because observation is often called for when it is unclear whether the patient is stable.").

around the statute by allowing hospitals to place patients in a limbo-like observation status without stabilizing them, secure in the knowledge that they could discharge the patient at any point, regardless of their condition, without incurring EMTALA liability.  This would condone, if not encourage, the practice of "patient dumping" that EMTALA was designed to prevent.[67]

Third, PMMC argues that the record shows that "the classification between an inpatient and observation admission at PMMC is purely a financial or insurance classification," and so Mr. Salata should be treated as having been admitted as an inpatient.[68]  However, Dr. Chung testified that the decision to place a patient in observation, as opposed to admitting him or her as an inpatient, is always made by a physician based on "clinical criteria,"[69] and PMMC acknowledges that Mr. Salata was placed in observation because he did not meet the clinical requirements for inpatient admission.[70]  Thus, there is at least a genuine factual dispute regarding whether the care Mr. Salata received in observation was substantially similar to the care he would have received had he been admitted as an inpatient, and summary judgment is inappropriate.

---

[67] *See* H.R. Rep. No. 99-241, pt. 3, at 27 (July 31, 1985), *reprinted in* 1986 U.S.C.C.A.N. 579, 605 ("EMTALA was enacted because Congress was concerned "that hospital emergency rooms [were] refusing to accept or treat patients with emergency conditions if the patient [did] not have medical insurance.").

[68] Doc. No. 85 at 9.  This "financial or insurance classification" has important consequences for patients.  Inpatient services are covered under Medicare Part A, whereas outpatient services, including observation status, are covered under Part B, and "[t]he amount that a Medicare beneficiary pays out of pocket varies significantly based on whether the services provided were covered under Part A or Part B."  *Barrows v. Burwell*, 777 F.3d 106, 109 (2d Cir. 2015).  Outpatient coverage under Part B is generally less favorable and requires "a co-payment for each service received," whereas inpatient coverage under Part A will generally cover hospital services apart from a one-time deductible for the first 60 days in the hospital."  *Id.*  In short, a patient placed in observation status may expect to foot a much larger medical bill than one admitted as an inpatient, even if they receive the same services.

[69] Doc. No. 72 ¶¶ 27(b)-(d).

[70] *Id.* ¶ 27(e).  *Sapssov v. Health Management Associates*, cited by PMMC on this point, does not aid PMMC's argument and instead explains that there are clinical distinctions between in-patient admission and observation status.  *See* 22 F. Supp. 3d 1210, 1215 (M.D. Fla. 2014) ("Inpatient status is generally reserved for patients in need of higher intensity services, while observation status patients require less intensive services or are still in diagnostic stages to determine if inpatient admission will be necessary.").

In short, the CMS regulations and guidance make clear that admission for observation does not end a hospital's EMTALA obligations, and PMMC's arguments to the contrary are not persuasive.  Summary judgment on this ground will be denied.

### 2.  Whether Plaintiff Satisfies the Requirements for an EMTALA Stabilization Claim

PMMC also argues that Plaintiff cannot make out the three elements of an EMTALA failure-to-stabilize claim.  To do so, Plaintiff must show:  (1) Mr. Salata "had an emergency medical condition; (2) the hospital actually knew of that condition; and (3) [Mr. Salata] was not stabilized before being transferred."[71]  The record does not support a grant of summary judgment on any of these elements.

### a.  Emergency Medical Condition

Regarding the first element, EMTALA defines an "emergency medical condition" as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . . .[72]

PMMC acknowledges that unstable angina constitutes an emergency medical condition,[73] and instead argues that Mr. Salata did not have an emergency medical condition at the time of discharge because he was not reporting severe pain, he was sitting upright and alert, and his symptoms appeared to have improved after he received proton pump inhibitors for reflux.[74]

---

[71] *Torretti*, 580 F.3d at 178 (quoting *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 883 (4th Cir. 1992)).  Congress has defined "transfer" to include the discharge of a patient, as occurred here.  42 U.S.C. § 1395dd(e)(4).

[72] 42 U.S.C. § 1395dd(e)(1)(A).

[73] Doc. No. 85 at 16.

[74] Doc. No. 76 at 5.

PMMC also argues that Mr. Salata was not suffering from an emergency medical condition because Dr. Patel diagnosed him with gastric reflux, rather than unstable angina.[75]

However, there is also evidence that could establish that Mr. Salata was suffering from an emergency medical condition at discharge.  Dr. Chung initially noted that Mr. Salata's pain might be caused by an unstable angina, PMMC never performed the stress test necessary to rule this out as the cause, and Mr. Salata was ultimately sent home with discharge instructions for "acute coronary syndrome."[76]  As Plaintiff notes, Mr. Salata reported his pain as "intermittent" upon arrival, so the fact that his symptoms appeared improved at discharge does not necessarily show that he was not suffering from an emergency medical condition.[77]  PMMC also does not dispute that Mr. Salata suffered "severe substernal burning" shortly before his discharge—and after his last visit with Dr. Patel—suggesting that his condition had not abated and that Dr. Patel's reflux diagnosis may have been incorrect.[78]  Based on this and other record evidence, Plaintiff's expert, Dr. Charash, has offered his opinion that Mr. Salata was "highly unstable" at the time of discharge and was at "extreme risk for otherwise preventable sudden death."[79]  At the very least, there is a factual dispute regarding whether Mr. Salata was suffering from an emergency medical condition at the time of his discharge.[80]

---

[75] Doc. No. 85 at 15.

[76] Doc. No. 72 ¶¶ 18, 39, 41, 42.

[77] Doc. No. 72 ¶ 5-6; Doc. No. 82 at 11.

[78] Doc. No. 72 ¶¶ 33-35.

[79] Doc. No. 82, Ex. 3 (Opinion of Dr. Bruce D. Charash) at 8-9.  PMMC argues that Dr. Charash's opinion is relevant only to Plaintiff's state-law claims based on medical malpractice, Doc. No. 85 at 16-17, but Dr. Charash's opinion clearly addresses the issue of whether Mr. Salata was suffering from an emergency medical condition at the time of discharge and thus is relevant to the EMTALA claim as well.

[80] *Vickers v. Nash General Hospital, Inc.*, 78 F.3d 139, 145 (4th Cir. 1996), relied upon by PMMC, is inapposite as in that case the plaintiff failed to allege that the defendant hospital identified the emergency condition in question, whereas here it is undisputed PMMC identified unstable angina as a possible cause of Mr. Salata's symptoms. PMMC also cites *Delibertis*, 152 F. Supp. 3d at 402, but in that case the undisputed evidence showed that the patient was stable at the time of discharge and only deteriorated afterwards, whereas here there is evidence that Mr. Salata was unstable at the time of discharge.

### b. Actual Knowledge

Regarding the second element of a failure-to-stabilize claim, Plaintiff must show that PMMC had actual knowledge of Mr. Salata's emergency medical condition at the time of discharge, as PMMC cannot be held liable under EMTALA for conditions it did not detect.[81] PMMC argues that Plaintiff cannot show actual knowledge because neither Dr. Patel, Mr. Salata's consulting cardiologist, nor anyone else at PMMC determined that Mr. Salata was suffering from unstable angina at the time of discharge.[82]

This assertion is belied by the record. Mr. Salata's primary assessment revealed cardiac risk factors, Dr. Chung identified unstable angina as a possible cause of Mr. Salata's symptoms, the stress test necessary to rule out that diagnosis was never performed, and Mr. Salata was discharged with instructions for "acute coronary syndrome," all of which could evidence actual knowledge on PMMC's part.[83] PMMC makes much of the fact that Dr. Patel diagnosed Mr. Salata with reflux prior to discharge, but Dr. Patel was not informed that Mr. Salata had suffered severe substernal burning shortly beforehand, so his diagnosis alone does not necessarily show that PMMC lacked actual knowledge as to Mr. Salata's condition.[84] In short, there is record evidence supporting Plaintiff's argument that PMMC had actual knowledge of an emergency medical condition, and the Court will not weigh the evidence on a summary judgment motion.[85]

---

[81] *Torretti*, 580 F.3d 178.

[82] Doc. No. 76 at 5-6.

[83] Doc. No. 72 ¶¶ 18, 39, 41, 42.

[84] *Id.* ¶¶ 33-34.

[85] *See Kauffman v. Franz*, Civil Action No. 07-CV-5043, 2010 WL 1257958, at *3 (E.D. Pa. Mar. 26, 2010) (concluding that summary judgment on EMTALA claim was not warranted based on lack of actual knowledge because plaintiff presented to the hospital complaining of chest pains, which was sufficient to create an issue of material fact regarding defendants' knowledge of an emergency medical condition).

### c. Stabilization

Finally, PMMC argues that Plaintiff cannot establish the third element of an EMTALA claim because Mr. Salata was stabilized prior to discharge.[86]  Under EMTALA, "stabilized" means that "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual."[87]  PMMC claims that because Mr. Salata's symptoms had improved and he was not complaining of chest pain at the time of discharge, Plaintiff cannot show that he was unstable.

Here, too, PMMC glosses over conflicting evidence.  As discussed, there is evidence that Mr. Salata suffered severe substernal burning shortly before discharge (of which Dr. Patel was never made aware), that his chest pain had been intermittent all along (meaning that its absence at the time of discharge may not be particularly noteworthy), and that unstable angina was never ruled out as the cause of his symptoms, in part because certain testing was never done.[88]  Plaintiff's expert, Dr. Charash, also opines that Mr. Salata was not stabilized based on his medical record.[89]  It is for the factfinder to evaluate these issues and determine whether Mr. Salata was stabilized.

---

[86] Doc. No. 76 at 6; Doc. No. 85 at 20-21.

[87] 42 U.S.C. § 1395dd(e)(3)(B).

[88] PMMC argues that Dr. Chung's earlier opinion that unstable angina might be the cause of Mr. Salata's symptoms should be disregarded since Dr. Chung rendered that opinion the day before Mr. Salata's discharge and was not involved with the discharge.  Doc. No. 85 at 20.  But Dr. Patel, the cardiologist involved in Mr. Salata's discharge, also did not examine Mr. Salata immediately before his discharge and was never made aware of Mr. Salata's episode of severe substernal burning that morning, so it makes little sense to ignore Dr. Chung's opinion while crediting Dr. Patel's.  In any event, this type of evidence-weighing is inappropriate for summary judgment and will be left to the factfinder.

[89] PMMC argues that expert testimony is insufficient to prove that Mr. Salata was unstable, relying on *Torretti v. Paoli Memorial Hospital*, No. 0912155, 2008 WL 8177876 (E.D. Pa. Jan. 28, 2008).  Here, however, there is also non-expert evidence on this point.  Moreover, the court in *Torretti* granted summary judgment because the plaintiffs could not show "actual knowledge," not because expert testimony failed to establish that the patient in question was not stabilized.  *Id.* ("Dr. Klein does not address what Dr. Gerson actually knew at the time, only what Dr. Gerson should have known.  Dr. Klein's opinion might be sufficient to sustain a medical malpractice claim but it is not enough to support a claim under EMTALA.") (no pagination available).

**B. Dr. Chung's Motion for Summary Judgment**

Dr. Chung moves for summary judgment on the three state-law claims against him (the survival action, wrongful death, and negligence claims), all of which are predicated on medical malpractice.  Dr. Chung argues that Plaintiff has failed to present expert evidence that Dr. Chung deviated from the applicable standard of care, and that this is fatal to Plaintiff's claims.[90] Plaintiff responds that the opinion of its proffered expert Dr. Rubin, whose qualifications Dr. Chung does not challenge, is sufficient to survive summary judgment.[91]  The Court agrees.

"[T]o prevail in a medical malpractice action, a plaintiff must establish a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm."[92]  "Because the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury."[93]  "In other words, the general rule under Pennsylvania law is that expert testimony is required in order for a plaintiff to establish the elements of a prima facie case of medical malpractice."[94]

Dr. Chung argues that Plaintiff has failed to present such expert testimony because Dr. Rubin does not offer any criticism of Dr. Chung's actions on May 28, when he evaluated Mr. Salata, and Dr. Rubin's opinion focuses on Mr. Salata's May 29 discharge, when Dr. Chung was

---

[90] Doc. No. 77 at 2-4.

[91] Doc. No. 84 (Plaintiff's Response to Dr. Chung's Motion for Summary Judgment) at 7-10.

[92] *Toogood v. Owen J. Rogal, D.D.S, P.C.*, 824 A.2d 1140, 1145 (Pa. 2003) (citation and internal quotation marks omitted).

[93] *Id.* (citation omitted).

[94] *Brown v. Hahnemann*, 20 F. Supp. 3d 538, 542 (E.D. Pa. 2014) (emphasis omitted).

admittedly not present at PMMC.[95]  However, Dr. Rubin's report clearly contains an opinion that Dr. Chung breached a duty to Mr. Salata and that this breach caused his injury.  In particular, Dr. Rubin opines that Dr. Chung:  (1) failed to ensure that Mr. Salata "received the testing he needed"; (2) failed "to advocate on Salata's behalf and ensure he obtained a cardiac catheterization and/or a stress EKG as originally planned by Dr. Patel"; (3) failed either to implement Dr. Patel's original consultation plan or to obtain a consultation from a different cardiologist once it became apparent that Dr. Patel was not going to implement the plan; and (4) failed to prevent Mr. Salata's discharge until the appropriate testing was conducted.[96]  Dr. Rubin further opines that these failures resulted in Mr. Salata's discharge, which in turn contributed to his death.[97]  Thus, Plaintiff has presented expert evidence in support of the claims against Dr. Chung.[98]

Despite this, Dr. Chung argues that Dr. Rubin's opinion is insufficient based on certain answers Dr. Rubin gave at his deposition.  First, Dr. Chung argues that Dr. Rubin admitted that he had "no criticism" of Dr. Chung's actions on May 28, and therefore effectively repudiated his criticisms of Dr. Chung.[99]  This argument misses the point, as the criticisms in Dr. Rubin's report are based on Dr. Chung's failure to follow through in his treatment of Mr. Salata, including by ensuring that Mr. Salata received necessary testing and that Dr. Patel's treatment plan was implemented.[100]  Dr. Rubin's testimony is consistent with this, and makes clear that while Dr. Rubin had no criticism of Dr. Chung's decisions on May 28, Dr. Chung was nonetheless

---

[95] Doc. No. 77 at 1-2.

[96] Doc. No. 84-1 (Report of Brian R. Rubin, M.D.) at 4.

[97] *Id.* at 5.

[98] *Compare with Delibertis*, 152 F. Supp. 3d at 403 (granting summary judgment on medical malpractice claim where plaintiff's expert failed to include any language in her report implicating doctor).

[99] Doc. No. 86 (Dr. Chung's Reply in Support of Motion for Summary Judgment) at 5.

[100] Doc. No. 84-1 at 4.

obligated to ensure that the cardiologist's treatment plan was followed or that another cardiologist was consulted, which he failed to do.[101]

Next, Dr. Chung argues that Dr. Rubin's criticisms focus entirely on other individuals at PMMC, pointing to Dr. Rubin's testimony that Mr. Salata's cardiologist "was responsible for his poor recommendations, [and] lack of treatment of the patient."[102]  However, in the same answer, Dr. Rubin explained that "Dr. Chung as the attending physician ha[d] a responsibility" as well, and it is thus clear that Dr. Rubin was not backtracking on his opinion of Dr. Chung or otherwise absolving him of responsibility.[103]

Finally, Dr. Chung cites snippets of testimony in which Dr. Rubin apparently cannot remember the names of particular individuals at PMMC or whether certain events occurred on May 28 or May 29, but these criticisms go to the weight of his testimony, not the viability of Plaintiff's claims.[104]  At bottom, Dr. Chung argues that Dr. Rubin's deposition testimony casts doubt on his opinions, which is an issue for the factfinder and not grounds for summary judgment.[105]

---

[101] Doc. No. 90-2 (Excerpt from the Deposition of Brian R. Rubin, M.D.) at 53:24-54:16 (testifying that "[o]nce [Dr. Chung] got the cardiologist's plan, he should have implemented a different – he should have gone another way . . . either speaking to the cardiologist directly or getting another cardiologist").

[102] Doc. No. 86 at 5 (quoting Rubin Dep. Tr. at 87:14-88:2).

[103] *Id.*

[104] *Id.* at 5-6.

[105] Dr. Chung provides no case law in support of his position that the alleged problems with Dr. Rubin's deposition testimony are grounds for a summary judgment motion.  Rather, Dr. Chung cites a series of cases for the general proposition that a plaintiff in a medical malpractice case must present expert testimony in support of his or her claims, but as explained, Dr. Rubin's testimony plainly satisfies this requirement, and Dr. Chung's criticisms go only to weight.

### C.  Dr. Patel's Motion to Dismiss

Lastly, Dr. Patel argues that if Plaintiff's EMTALA claim is dismissed, this case should be dismissed for lack of subject matter jurisdiction.[106]  Because the Court will deny PMMC's motion on the EMTALA claim, Dr. Patel's motion will be denied.

### IV.    CONCLUSION

For the reasons stated above, Defendants' motions will be denied.  An appropriate Order will be entered.

---

[106] Doc. No. 78 (Dr. Patel's Motion to Dismiss).